# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00055-CR
## NO. 03-01-00056-CR

**Esquiel Fuentes Ramirez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
### NOS. 0970765 & 0970766, HONORABLE BOB PERKINS, JUDGE PRESIDING

The district court convicted Esquiel Fuentes Ramirez of two counts of injury to a child with serious bodily injury and assessed sentence at fifty years in prison. *See* Tex. Pen. Code § 22.04 (West Supp. 2002). This was Ramirez's second trial on charges that he injured his twin two-month-old daughters and sexually assaulted the girls' mother, Norma Cerda.[1] Ramirez was originally convicted on all three counts. This court reversed the convictions because appellant received ineffective assistance of counsel, and remanded for new trials. *Ramirez v. State*, 987 S.W.2d 938, 946 (Tex. App.—Austin 1999, no pet.). On retrial, he was acquitted of sexual assault. By two points

---

[1] Norma Cerda lived with appellant as his wife (and had four children by him) though they apparently were never married ceremonially. She testified that he told her they could not marry until he got his previous marriage annulled, which he never did. Appellant denied Cerda's story; he said they never married because they were lazy. At this trial, she insisted on being called Norma Cerda.

of error, appellant complains that the evidence is factually insufficient to support the finding that he was the person who injured his daughters. We will affirm the convictions.

## SCOPE AND STANDARD OF REVIEW

When reviewing the factual sufficiency of the evidence, we consider all the evidence neutrally toward the verdict. *Johnson v. State*, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). We will set aside a verdict for factual insufficiency only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). We should not substantially intrude upon the jury's role as the sole judge of the weight and credibility given to witness testimony. *Johnson*, 23 S.W.3d at 7 (citing *Jones v. State*, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996)). The court in *Johnson* wrote:

> We can consider only those few matters bearing on credibility that can be fully determined from a cold appellate record. Such an approach occasionally permits some credibility assessment but usually requires deference to the jury's conclusion based on matters beyond the scope of the appellate court's legitimate concern. *See* George E. Dix & Robert O. Dawson, 42 Texas Practice—Criminal Practice and Procedure § 36.69 (Supp. 1999). Unless the available record clearly reveals a different result is appropriate, an appellate court must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.

*Johnson*, 23 S.W.3d at 9.

## EVIDENCE AND TESTIMONY

It is undisputed that the girls, Vanessa and Valerie, suffered serious bodily injury. The identity of their assailant is disputed; Cerda testified that appellant hurt them, but he denied it.

2

Cerda's credibility is questioned by many witnesses who testified that she lies well; in this case, she has told more than one version of these events. Some of the medical evidence is consistent with the date Cerda asserts the assault occurred, but not all. Some of the physical evidence supports Cerda's story, but not all. We therefore must review the evidence of the girls' injuries, the parents' versions of how they suffered those injuries, the physical evidence from the family's house, and the parents' credibility before analyzing the evidence under the appropriate standard.

**The nature of the girls' injuries**

On December 19, 1996, nine days after a doctor described the girls as "thriving" at a seven-week checkup, Vanessa was admitted into a hospital suffering from seizures. Tests revealed signs of serious injuries including brain injury, retinal bleeding, and broken ribs. On January 10, 1997, Valerie was admitted to a hospital after a routine checkup revealed she had a swollen head and retinal hemorrhaging. Both girls continue to struggle with the effects of these injuries and are attending special education classes; Vanessa's impairments are more severe, including legal blindness in one eye.

Dr. David Anglin, medical director of the intensive care unit at Children's Hospital of Austin, testified that the girls' injuries were consistent with intentional abuse. The nature of the fluids surrounding their brains indicated possible multiple traumas to their heads. The broken ribs on both sides of Vanessa indicated the application of a large amount of squeezing force because babies' bones are quite pliable compared to adults' bones. Retinal hemorrhaging is often caused by repetitive to-and-fro acceleration and deceleration—i.e., shaking. Retinal hemorrhaging is extremely uncommon

with other types of severe trauma such as being thrown through a windshield or dropped from a height. The concurrence of these head, eye, and rib injuries indicates intentional trauma.

Doctors attempting to date the injuries based on Vanessa's symptoms did not all agree on a particular date. Anglin testified that the color of the blood in Vanessa's eyes indicated that she was shaken severely three to seven days before he examined her on December 19, 1996. He testified that the calcification along the rib fractures indicated that she was injured between eight and fourteen days before the December 21 bone scan. Anglin testified that the most recent brain injury appeared to have occurred seven to ten days before the examination, and that a previous injury or injuries may have occurred as much as twenty-one days before the exam. The injuries must have occurred between the favorable checkup on December 10 and the latest estimated date of December 16; considering all the estimates together narrows the range to December 12 or 13. Anglin conceded that pediatric radiologist Dr. James Rytting, who opined that calcification began no earlier than ten days after injury, had more experience in that estimation; that puts the injuries on December 11 at the latest. Dr. Keith Busse, an ophthalmologist, testified that the uniform color of the blood in Vanessa's eyes led him to conclude that she had suffered but one injury; he conceded, however, that two injuries occurring within three days of each other might appear to be a single injury. He testified that the blood in Valerie's eye was so old by January 17, 1997 that he would estimate only that it was more than a week old.

**The cause of the girls' injuries**

Only the two parents testified regarding seeing possible causes of the girls' injuries. Both parents have consistently denied they inflicted the injuries themselves. Cerda has told evolving

4

stories regarding her knowledge of who injured the girls. The only incident appellant recalled seeing that might have caused the injuries involved their three-year-old brother pushing their bassinet off a table.

Cerda's versions of events

Cerda has given many explanations for how the children suffered their injuries. We will discuss her original denial of knowledge and sidelong implication of her three-year-old son, her accusation of appellant in her statement to police, her recantation of that accusation in a psychological exam, her accusation of a neighbor before and during the previous trial, and her accusation of appellant in the second trial.

*December 1996/January 1997 statements.* Originally, Cerda denied knowing how the injuries might have occurred. She passed along appellant's recollection of their son hitting the girls with a toy truck and possibly knocking them out of a bassinet.

*January 24, 1997 statement to police.* Interrogated over the course of several hours, Cerda claimed for several hours that appellant was confessing in his sleep. She eventually asserted that she saw him shake the girls. In her written statement, she said that she got up at 3:30 a.m. on December 15, 1997 to feed the crying twins. After feeding them, she went to take a shower, then a bath. Appellant came into the bathroom demanding that they have sex. When she declined, he pulled her out of the tub by her hair, dragged her into the bedroom, and threw a broken door on her. When she tried to get away, he hit the wall and punched a hole in it. He picked her up and broke a window with her head. The girls started crying and appellant went over to their crib, yelled at them to be quiet, picked up Valerie, and shook her until she was quiet. He then picked up Vanessa,

5

squeezed her tight, and shook her until Cerda agreed to have sex with him. After he left, their son, who was present for most of the encounter, then brought Cerda a blanket.

*January 31, 1997 psychological exam.* Cerda told Dr. David Poole a story similar to her statement to police up until appellant picked up the girls. At that point, she says she blacked out and cannot distinguish what really happened thereafter from what she dreamed.

*February 1997-September1997.* Cerda told Will Cunningham, a caseworker from Child Protective Services ("CPS"), that her neighbor Janie Burks called her and tearfully confessed to shaking the children. She told that same story in June 1997 to Diana Verdin, Travis County Mental Health-Mental Retardation clinician. Cerda nevertheless said in parenting classes in April 1997 and to a prosecutor in June 1997 that her husband injured the children. In August 1997, Cerda told Verdin that she never saw appellant hurt her children; she also claimed she did not want appellant in her life. She claimed that police coerced her January statement and that prosecutors and CPS workers were angry at her for recanting her accusation of her husband.

*This trial.* Cerda testified to a version similar in most respects to her January 1997 statement to the police. It diverges in some respects. She added that appellant was edgy and quick to anger because of dietary supplements he was taking. She indicated that he punched the hole in the wall over the crib in anger that, in context, seemed directed toward the girls. She also testified that he picked up Vanessa first, whom she described as more petite; later, after her physician testified that Vanessa weighed more, she testified that Vanessa was bigger. When confronted with the change in order of shaking from previous testimony, she conceded she might have made a mistake.

6

<u>Appellant's version of events</u>

Appellant has consistently denied committing any of the offenses alleged. He testified that Cerda, not he, initiated the sexual encounter. The receiving blanket got blood on it because they put it underneath them while they were having sex to protect the bed sheets. He does not recall when the toilet paper holder got broken. He said he accidentally punched the hole in the wall while working out with weights.

He admitted breaking the window, but testified that he did it in July 1996 by throwing a boxed set of Dr. Seuss books through it during an argument with Cerda. He testified that he contacted his landlord to get the window fixed, but his landlord told him to fix it himself, so he just taped cardboard over the window. When Cerda moved out of the house in January 1997, she took the only key with her and so he used the window to get in and out of the house; he cut his hand on the remaining glass while passing through the window. There was a bucket underneath the window outside the house, consistent with this use of the window.

He also testified that Cerda called him at work overwhelmed by the crying children. He did not, however, accuse her of inflicting the injuries.

**Physical evidence**

After Cerda gave her statement on January 24, 1997, police went to the house where the family was living when the incident occurred; appellant still lived there alone. Cerda pointed out stains on the window, carpet, and blanket that she considered blood. She showed them hair on the door she claimed she hit while being dragged out of the bathroom.

7

The results of the tests varied. The blanket contained her blood and appellant's semen, but that is consistent with both versions of the use of the blanket; testers did not find glass on the blanket. Tests of the blood on the window sill did not identify the source. The spots on the floor proved not to be blood and the testable hairs on the door were not hers.

The investigation confirmed the reported damage to the home—the broken toilet paper dispenser, the hole in the wall, and the broken window. This damage is largely consistent with both parents' trial testimony, but does not confirm or disprove any of the versions.

**Credibility**

Though the credibility of witnesses is generally important, Cerda's credibility is critical because she is the only witness who testified to seeing appellant inflict the injuries. The credibility of appellant's denial is also important.

*Cerda's credibility.* Cerda's many versions of events clearly undercut her credibility, as do the numerous witnesses who testified that she had difficulty telling the truth. Some evidence corroborates her trial testimony, however, and some witnesses explain away her fluctuating version of events as the product of being abused by appellant.

The many inconsistent versions that Cerda told of the assault are set out above. Suffice it to say that, even between the January 1997 statement and her similar 2000 trial testimony, there are notable differences. The lack of glass on the receiving blanket may cast some doubt on her assertion that she used it to wipe window glass off her face, and the lack of blood on the carpet may cast some doubt on her assertion that she bled profusely; neither of these inconsistencies, however, bears directly on whether appellant shook the girls.

8

Cerda has a reputation generally for not telling the full truth. Cerda's sister, her neighbor, CPS workers, and her psychologist all testified that Cerda has some trouble telling the truth. Austin police detective Melvin Mark Spangler testified that Cerda lied persistently and in great detail. She lied about her educational history to her psychologist, she lied about calling emergency medical services for instances of abuse, and both Cerda and her mother say Cerda lied when accusing Cerda's father of abuse. Cerda testified that she lied when she accused the babysitter and lied when she said she was not lying about accusing the babysitter to help appellant avoid jail.[2] She said she thought keeping him out of jail would enhance her chances of keeping custody of her children. CPS caseworker Cunningham called her perhaps the most convincing liar he has met.

But there were also many witnesses who testified that appellant abused Cerda and that her vacillation is consistent with that abuse. Her sister, Connie Cerda, and neighbor, Orania Cerio, testified that they saw bruises on Cerda. Cerio testified that when Cerda was on her side of the duplex, Cerda was always afraid that appellant would come home, find her not at home, and be angry. Cerio's mother, Rosa Perez, also a neighbor, testified that she sometimes heard thumps (like someone being pushed into the wall) so powerful that heavy wall hangings on her side of the duplex would move; she denied playing her stereo loudly and provoking appellant to bang on the wall to get her to quiet it. Perez also testified that when she once used the Ramirezes' washing machine with Cerda's permission, appellant became enraged and forced her to take the clothes out before the washing cycle

---

[2] Instead, her change in accusation prompted CPS to stop seeking to return custody to her and begin seeking termination of her rights to all her children. Her rights have been terminated. Her three older children live with her mother and her youngest, born September 1997, lives with her aunt.

was complete. Social worker Gail Rice testified that abused women will sometimes act to protect their abusers and can lose touch with reality.

Detective Spangler, who testified that Cerda was an accomplished liar and denied her accusations that he coerced her January 1997 statement, testified that he thought that Cerda finally told the truth in her January statement.

*Appellant's credibility*. Appellant's version of the window-breaking cuts both ways on his credibility. Appellant's brother confirmed his story about the manner of the window breaking. Appellant's landlord, however, denies that appellant ever informed him of the broken window and asserts that he would have fixed it within three days of learning of it. The fact that appellant used the window for egress is consistent with its being broken, but does not bear on when or how the window was broken.

Although appellant's story of the girls' brother pushing their bassinet off the table does not account for the shaking-related injuries, the discrepancy between the injuries caused does not exclude the possibility that both the bassinet incident and the shaking incident occurred.

**ANALYSIS AND CONCLUSION**

Aside from the general and well-founded attacks on Cerda's credibility, appellant's chief complaint seems to be that the range of dates she gave for the assaults—December 15 through 17—do not match up with the dates the doctors' examinations indicated—December 11 at the latest, he argues, according to the pediatric radiologist's analysis of the bone scan of Vanessa's ribs.

First, we note that the State is not held to prove a specific date, so long as the date proved is anterior to the presentment of the indictment and within the statutory limitation period. *See*

Tex. Code Crim. Proc. Ann. art. 21.02(6) (West 1989); *Scoggan v. State*, 799 S.W.2d 679, 680 n.3 (Tex. Crim. App. 1990); *Thomas v. State*, 753 S.W.2d 688, 693 (Tex. Crim. App. 1988). Appellant argues the medical testimony shows the assaults occurred no later than December 11. Further, Dr. Anglin, while admitting that the radiologist had more experience, nevertheless estimated that calcification could begin eight days after injury; by that measure, the rib fractures could have occurred as late as December 13. Both dates precede the indictment and are within the limitations period. *See* Tex. Code Crim. Proc. Ann. art. 12.01 (West Supp. 2002).

Further, even if Vanessa's ribs were broken no later than December 11, that does not rule out a later shaking assault on both girls. The blood in Vanessa's eyes indicated an assault involving severe shaking occurring within a week of December 19. The breaks in her ribs indicated an assault involving squeezing occurring slightly before that. Variations in the swelling in Vanessa's brain indicated more than one assault occurred in a three-week period. It is consistent with this evidence to find that Vanessa was severely injured by being shaken by appellant when and as Cerda testified while allowing for the possibility that other injuries were inflicted in uncharged assaults by unnamed persons. Valerie's brain swelling and the blood in her eyes are consistent with the conclusion that she was also shaken by appellant when and as Cerda testified. The finding that appellant's shaking of both girls inflicted serious bodily injury is supported by their brain injuries alone without regard to whether the rib injuries were inflicted in the same assault.

We conclude that the verdict withstands application of the standard of review. We can reverse for factual insufficiency only if the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, and we cannot reject a fact finder's credibility

11

determination unless the record clearly reveals a different result is appropriate. *See Clewis*, 922 S.W.2d at 129; *Johnson*, 23 S.W.3d at 7-9. Although the record contains evidence that undercuts Cerda's credibility and contradicts the verdict, we cannot conclude that the record clearly requires a different result or that the evidence contrary to the verdict overwhelms the evidence supporting it. The district court could find, notwithstanding Cerda's reputation for mendacity and record of contradictory accusations, that Cerda was telling the truth when she testified that appellant shook their children violently enough to inflict serious bodily injury.

We overrule both points of error and affirm the judgment.

_____

Mack Kidd, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed: February 14, 2002

Do Not Publish